UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS  DIVISION

ANGEL LEARNING, INC.,                    )
              Plaintiff,               )
                              )
      vs.                                        )          1:08-cv-1259-LJM-JMS
                              )
HOUGHTON MIFFLIN HARCOURT      )
PUBLISHING COMPANY,                  )
              Defendant.            )

## ORDER

      This matter comes before the Court on several pending motions that are ripe for ruling.  This dispute between the plaintiff, ANGEL Learning, Inc. ("ANGEL"), and the defendant, Houghton Mifflin Harcourt Publishing Company ("HMH"), arises out of a software licensing agreement pursuant to which ANGEL agreed to provide HMH with software tailored to HMH's business needs in return for payment from HMH.  In its original Complaint, ANGEL asserted a claim for breach of contract against HMH, claiming HMH failed to make timely payments required by the parties' agreement.  ANGEL subsequently supplemented its Complaint by adding a claim for declaratory relief, seeking a declaration regarding the parties' respective duties under the agreement in the event a Notice of Termination is served.  HMH answered ANGEL's Complaint with claims of its own.  HMH asserts two breach of contract claims and one claim for unjust enrichment.

      Pending before the Court are ANGEL's motion for summary judgment on its claim for declaratory relief and the parties' cross motions for summary judgment on ANGEL's breach of contract claim and each of HMH's counterclaims.  In addition, ANGEL moves the Court for leave to file a Second Supplemental Complaint, which HMH opposes as untimely,

among other things.  The parties have completed several rounds of briefs,[1] and the motions

are now ripe for ruling.  The Court rules as follows.

# I.  BACKGROUND

## A.  THE LMS AGREEMENT

On September 1, 2007, ANGEL entered into a Learning Management Systems

Agreement (the "LMS Agreement") with HMH's predecessor in interest, Harcourt, Inc.

("Harcourt").   At the time, Harcourt provided instructional materials and educational

services. LMS Agreement (Dkt. No. 14-1) at 1.  ANGEL provides learning management

system ("LMS") software and related services.  *Id.*; Dkt. No. 33-1 ¶ 4.  The purpose of the

LMS agreement was for ANGEL to produce a fully functional version of the ANGEL LMS,

ANGEL's basic LMS software, tailored to Harcourt's business needs for pre-kindergarten

through the twelfth grades.  LMS Agreement at 1.

Accordingly, ANGEL granted Harcourt a license to use and host the ANGEL LMS,

together with any other programs necessary to tailor the software to Harcourt's needs.

LMS Agreement § 1.1.  ANGEL agreed to release the modified ANGEL LMS, which the

parties named *Think Central 2*, at three different stages.  The delivery deadlines for each

of these three releases, or "code drops," were: (1) January 1, 2008, for the first release,

named in the LMS Agreement as "Final Part A Delivery" (the "First Release"); (2) March 21,

2008, for the second release, named in the LMS Agreement as "Final Combined Code

Drop" (the "Second Release"); and (3) June 30, 2008, for the third release, named in the

---

[1] The parties' motions for leave to file surreply briefs (Dkt. Nos. 178, 192, 197)
and the corresponding motions to seal (Dkt. Nos. 195 and 198) are **GRANTED**.

LMS Agreement as "Safari Delivery" (the "Third Release") (the First, Second and Third Releases collectively, the "Releases").  Any failure by ANGEL to deliver "all or a substantial part" of the Releases by these dates constituted a "Major ANGEL Breach."   LMS Agreement § 21.48.

The LMS Agreement defines "Final Part A Delivery," "Final Combined Code Drop," and "Safari Delivery."  LMS Agreement §§ 21.21, 21.22, and 21.61.  Each definition is substantially the same and provides:

> [The relevant code drop or release (i.e. "Final Part A Delivery")] means the ANGEL LMS, the Tools, Documentation, and, to the extent required in order for the Deliverable Software in this delivery to pass all Verifications Tests that must be passed for this delivery, Modified Programs and other Initial Deliverables.  This delivery includes the source code for the Modified Programs that are included.

*Id.*

ANGEL provided warranties for each of the Releases.  For the First Release, ANGEL warrants, among other things, that the First Release will pass certain tests, called Verification Tests, which were agreed upon by the parties and are required to be passed to verify the functionality of the Releases.  LMS Agreement §§ 1.8[2] and 21.71.  The warranty period lasts forty-five days, and commences either (1) the day on which ANGEL "complete[d]" the First Release, delivered it to HMH, and notified HMH of the delivery; or (2) January 1, 2008, whichever date was later.  *Id.*  The LMS Agreement provides for warranties with similar terms for the Second and Third Releases.  LMS Agreement §§ 4.7,

---

[2] ANGEL and HMH subsequently agreed to amend the LMS Agreement to make the warranty described in Section 4.7 applicable to the First Release.  First Am. to LMS Agreement, Dkt. No. 14-5, § 2.

3

4.8.  The only difference is that, unlike Section 1.8, Sections 4.7 and 4.8 did not identify a specific date on which the warranty would commence.  *Id.*

The warranties only apply if HMH provides timely notification to ANGEL of any failure or non-conformity within the warranty period.  *Id.*  The notice must "specifically identify the failures and non-conformities."  *Id.*  ANGEL has thirty days from the date it receives the notice (the "first notice") to remedy the issues identified in the notice.  *Id.* §§ 4.7, 4.8, 18.3(a).  If the failure or non-conformity continues, and is not the result of HMH's errors, HMH may send ANGEL another notice (the "second notice") "at any time [after the first thirty day period has elapsed] while the failure remains uncured."  *Id.* § 18.3(a).  If the failure continues for a period of thirty days after the second notice was given by HMH (the "cure period"), the LMS Agreement permits HMH to terminate the LMS Agreement and receive a refund of the fees it paid to ANGEL.  *Id.* § 18.3(a) and (b).  Section 18.3 provides the "exclusive remed[y] of [HMH] for ANGEL's failure to correct any failure of [the Releases] to conform to the warranties."  *Id.*

In addition to the Releases, the LMS Agreement contemplated that ANGEL might provide HMH with additional code drops pursuant to statements of work.  *Id.* § 4.5.  Similar to the Release specifically defined in the LMS Agreement, ANGEL provided HMH with a thirty-day warranty that the modified release would, among other things, successfully execute any applicable Verification Tests.  *Id.* § 4.9.  Any warranty on a statement of work was contingent upon HMH's timely notification to ANGEL of any failure or nonconformity within the thirty-day warranty period.  *Id.*  With respect to timing, the warranties applicable to statements of work parallel the warranties for the Releases.  *Id.* §§ 4.9, 18.3.  After the "first notice," ANGEL had thirty days to fix the problems identified in the statement of work.

4

*Id.* § 18.3(a).  If, after that period lapses, the failures identified by HMH remain uncured, HMH may send ANGEL a "second notice . . . at any time while the failure remains uncured."  *Id.*  If, after the expiration of this thirty-day "cure period" the failures remain uncured, HMH may terminate the agreement and seek a refund.  *Id.* § 18.3(a) and (b).

A "Support Failure" exists under the LMS Agreement if the ANGEL LMS, among other things,(1) does not satisfy the Performance Criteria, or (2) does not perform without errors that significantly affect its ability to provide certain functionality.  *Id.* § 3.3.  ANGEL agreed to correct all Support Failures.  *Id.*  In the event of a Support Failure, HMH is required to report the error causing the failure to ANGEL by filling out a ticket form at the ANGEL Service Portal.  *Id.* Ex. E.  Exhibit E to the LMS Agreement, the Harcourt Support Procedures ("the Support Procedures"), lists specific information that Harcourt must provide in a ticket, including: (1)  the "Failure classification" (i.e. "System Down," "High," "Medium," and "Low" Failure as those terms are defined in the Support Procedures); (2) a full description of the problem, sample of output showing the failure, expected results, and, when applicable, a copy of the input transaction that caused the failure; and (3) any information ANGEL requests.  *Id.* Art. 4.1.  If ANGEL deems that the information submitted by HMH is insufficient to determine a solution, ANGEL can request additional information. If HMH fails to respond to ANGEL's request, HMH's request to remedy the Support Failure is deemed withdrawn.  *Id.* Art. 4.1.d.  However, HMH may reopen the request at a later date once it submits the requested information.  *Id.*  ANGEL is required to confirm its receipt of HMH's notification within a certain time period depending on the Failure classification.  *Id.* Art. 4.2.

5

ANGEL's release in response to a Support Failure, referred to in the LMS Agreement as a "Correction of Support Failure," has a corresponding warranty, which is the exclusive remedy for HMH in the event ANGEL fails to remedy a Support Failure. *Id.* § 18.2. If ANGEL fails to correct a "System Down" or "High Failure" Support Failure within thirty days after receiving the first notice, HMH may send ANGEL a second notice at any time while the Support Failure remains uncured. *Id.* If the Support Failure remains uncured for a period of thirty days after the second notice (i.e. during the "cure period"), HMH may "require ANGEL to support the . . . ANGEL LMS . . . and . . . terminate [the LMS Agreement.]" *Id.* However, HMH must provide its notice of termination (the "third notice") within thirty days after the cure period expires. *Id.* Upon termination, HMH is entitled to a refund within thirty days after ANGEL's receives HMH's notice of termination. *Id.* §§ 18.2, 21.65.

Under Article 10 of the LMS Agreement, a "Wind-Down Period" commences the day after the effective date of termination during which the LMS Agreement and all licenses thereunder remain in effect. *Id.* Art. 10. "The purpose of the Wind-Down Period is to give [HMH] sufficient time to migrate its customers to other LMS solutions, including without limitation the time required to arrange for those alternative solutions and the time required to amend or renegotiation [HMH]'s contracts with its customers." *Id.* § 10.2. During the Wind-Down Period, HMH must pay ANGEL fees (the "Wind-Down Fees"), the amounts of which are provided in the LMS Agreement. *Id.* § 10.4. HMH may choose to waive the Wind-Down Period. *Id.* § 10.1. Upon termination of the LMS Agreement, HMH is required to use diligent efforts to destroy the materials it received from ANGEL, including the customized ANGEL LMS. *Id.* § 10.5.

6

## B.  FACTS LEADING TO THIS DISPUTE

On January 1, 2008, ANGEL delivered the First Release to HMH.  Dkt. No. 33-5 ¶ 4.  HMH tested the First Release using the agreed upon Verification Tests and realized the First Release did not pass those tests.  Dkt. No. 92-5.  By January 11, 2008, HMH notified ANGEL of the failed verification tests.  *Id.*  The notice identified the passes and failures for each of the Verification Tests, and HMH linked each failure to a Test Track Pro ("TTP") number.  Dkt. Nos. 92-5, 92-6.  The TTP reports identified how the First Release failed each aspect of the Verification Tests and how ANGEL could recreate each error for testing and remediation.  Dkt. 92-6.  After receiving notice from HMH, ANGEL issued a series of revisions to the First Release.  Dkt. Nos. 92-7 to 92-12, 92-14 to 92-17.  HMH tested the revisions and again notified ANGEL that the First Release failed at least some of the Verification Tests.  *Id.*  Eventually, ANGEL and HMH closed the First Release, agreeing to remedy the issues identified in the First Release with the Second Release.  Dkt. 92-21. ANGEL and HMH routinely exchanged emails and had meetings regarding the release and testing process.  *See, e.g.*, Dkt No. 92-16; Mercer Dep. (Dkt. 92-51) at 102-03, 105-06.

On March 21, 2008, ANGEL delivered the Second Release to HMH.  Dkt. No. 33-5 ¶ 5.  As with the First Release, HMH tested the Second Release against the Verification Tests and found that none of the iterations of the Second Release passed all the tests.  Dkt No. 92-22.  HMH provided the test results to ANGEL and identified an associated TTP number.  *Id.*  ANGEL consequently issued revisions to the Second Release; however, none of those revision passed all the Verification Tests.  Dkt. Nos. 92-22 to 92-24.  HMH provided the Verification Test Results for each revision to ANGEL and identified a TTP number for each failure on April 19, 2008, May 6, 2008, and May 21, 2008.  *Id.*

Notwithstanding ANGEL's attempts to remedy the issues identified by HMH, ANGEL could not sufficiently repair the Second Release and the parties agreed to push those issues over into the Third Release.  Dkt. No. 92-51 at 209.

On May 31, 2008, ANGEL delivered the Third Release to HMH.  Dkt. No. 33-5 ¶ 5. HMH again identified several failed verification tests and met with ANGEL after ANGEL had the opportunity to review the results.  Dkt. No. 92-20.  As with the first two Releases, ANGEL attempted to repair the Third Release with the issuance of revisions, but HMH tested each new version of the software and the failures continued.  Dkt. Nos. 92-25 to 92-27.  Meanwhile, HMH contracted two independent consultants, RCM Technologies ('RCM" and Capgemini U.S. LLC ("Capgemini"), to test the version of *ThinkCentral 2* that had been delivered to date.  Dkt. Nos. 92-29, 92-30.  Both consultants opined that *ThinkCentral 2* was fundamentally flawed.  *Id.*

On August 26, 2008, Fiona O'Carroll, HMH's Senior Vice-President of Product Development, sent ANGEL a formal notice of breach ("August Notice").  Dkt. No. 92-32. The August Notice incorporated by reference the TTP numbers and reports and identified several of the Releases' defects and flaws.  *Id.*  Specifically, the August notice identified ten different persistent fundamental flaws previously identified by HMH, fourteen defects and flaws identified through HMH's assessments of *ThinkCentral 2*, and five material architectural errors that would seriously impact HMH's customers.  *Id.* at 2-4.  HMH included the specific LMS Agreement provisions pursuant to which it submitted the August Notice of Breach, including Sections 3.3, 4.3, 4.7 through 4.9, 9.2, 18.2, and Exhibit E. Finally, HMH also filed a service ticket through ANGEL's service portal.  Dkt. No. 92-33.

It attached the August Notice to the Ticket, and ANGEL received the ticket and August Notice.  Dkt. Nos. 92-33, 92-50.

Upon receipt of the August Notice, ANGEL's then-president, Christopher Clapp ("Clapp"), forwarded the notice to ANGEL's counsel and began preparing for litigation.  Dkt. No. 90-3 ¶¶ 1, 12-13.  ANGEL performed its own tests on *ThinkCentral. Id.* ¶ 15.  On September 3, 2008, ANGEL notified HMH that HMH was in breach of Section 7.1 of the LMS Agreement, which required HMH to pay ANGEL $2,004,000 on September 1, 2008 ("ANGEL's Notice").  Dkt. No. 92-34.  On September 19, 2008, ANGEL initiated the present action against HMH seeking payment of those fees.  Dkt. No. 1.

On or about September 30, 2008, ANGEL and HMH entered into a tolling agreement (the "Tolling Agreement").  Dkt. Nos. 92-35, 92-36.  The parties agreed that ANGEL would provide HMH with another release (the "Fourth Release").  *Id.*  In addition, the parties agreed to toll, among other things, the August Notice, ANGEL's Notice, the deadlines for any second or third notices, and any cure periods until December 1, 2008, the date of termination for the Fourth Release, or fifteen days after either party provided written notice of its election to terminate the Tolling Agreement.  Dkt. No. 92-35.

HMH hired another independent consultant, Collaborative Consulting ("Collaborative"), to test the Fourth Release.  The consultant concluded that, even with the Fourth Release, *ThinkCentral 2* failed to meet the LMS Agreement's requirements.  Dkt. No. 92-37 to 92-38.  Accordingly, on December 3, 2008, HMH sent ANGEL another notice of breach (the "December Notice").  Dkt. No. 92-39.  The December Notice informed ANGEL that HMH intended to terminate the LMS Agreement in the event ANGEL did not cure the performance failures identified in the August and December Notices within thirty

9

days.  *Id.*  ANGEL performed additional testing on *ThinkCentral 2*, but never shared any results from those test with HMH, nor did it submit any other revisions or releases.  Gross Dep. (Dkt. No. 92-52) at 118-21, 168-69.

Therefore, on January 9, 2009, HMH sent ANGEL a final notice of breach and termination notice (the "Termination Notice").  Dkt. No. 92-40.  In the Termination Notice, HMH waived a Wind-Down Period and demanded ANGEL to support *ThinkCentral 2* pursuant to Section 18.2 of the LMS Agreement until the later of June 2009 or when HMH completed its migration of its learning management system to a new platform.  *Id.* at 1-2. ANGEL subsequently supplemented its Complaint to add a claim for declaratory relief, requesting a declaration that HMH could not both waive the Wind-Down Period and require ANGEL to support the latest version of *ThinkCentral 2*.  Dkt. No. 47.

## II. STANDARD

### A. SUMMARY JUDGMENT

Summary judgment is granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c); *see CAE Screenplates v. Heinrich Fiedler GMBH*, 224 F.3d 1308, 1316 (Fed. Cir. 2000).  An issue is genuine only if the evidence is such that a reasonable jury could return a verdict for the opposing party.  *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A disputed fact is material only if it might affect the outcome of the suit in light of the substantive law.  *See id.*

10

The moving party has the initial burden to show the absence of genuine issues of material fact.  *See Wollin v. Gondert*, 192 F.3d 616, 620 (7th Cir. 1999); *Schroeder v. Barth*, 969 F.2d 421, 423 (7th Cir. 1992).  This burden does not entail producing evidence to negate claims on which the opposing party has the burden of proof.  *See Green v. Whiteco Indus., Inc.*, 17 F.3d 199, 201 & n.3 (7th Cir. 1994).   The party opposing a summary judgment motion bears an affirmative burden of presenting evidence that a disputed issue of material fact exists.  *See Wollin*, 192 F.3d at 621; *Gonzalez v. Ingersoll Milling Mach. Co.*, 133 F.3d 1025, 1031 (7th Cir. 1998); *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986); *Scherer v. Rockwell Int'l Corp.*, 975 F.2d 356, 360 (7th Cir. 1992).  The opposing party must "go beyond the pleadings" and set forth specific facts to show that a genuine issue exists.  *See Wollin*, 192 F.3d at 621; *Stop-N-Go of Madison, Inc. v. Uno-Ven Co.*, 184 F.3d 672, 677 (7th Cir. 1999); *Hong v. Children's Mem. Hosp.*, 993 F.2d 1257, 1261 (7th Cir. 1993), *cert. denied*, 511 U.S. 1005 (1994).  This burden cannot be met with conclusory statements or speculation, *see Cliff v. Bd. of Sch. Comm'rs*, 42 F.3d 403, 408 (7th Cir. 1994) (citing *McDonnell v. Cournia*, 990 F.2d 963, 969 (7th Cir. 1993));  *accord Chapple v. Nat'l Starch & Chem. Co.*, 178 F.3d 501, 504 (7th Cir. 1999); *Weihaupt v. Am. Med. Ass'n*, 874 F.2d 419, 428 (7th Cir. 1989), but only with appropriate citations to relevant admissible evidence.  *See* Local Rule 56.1; *Brasic v. Heinemann's Inc., Bakeries*, 121 F.3d 281, 286 (7th Cir. 1997); *Foreman v. Richmond Police Dept.*, 104 F.3d 950, 957 (7th Cir. 1997); *Waldridge v. Am. Hoechst Corp.*, 24 F.3d 918, 923-24 (7th Cir. 1994).  Evidence sufficient to support every essential element of the claims on which the opposing party bears the burden of proof must be cited.  *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

In considering a summary judgment motion, a court must draw all reasonable inferences in the light most favorable to the opposing party. *See Johnson Worldwide Assocs., Inc. v. Zebco Corp.*, 175 F.3d 985, 988 (Fed. Cir. 1999); *Wollin*, 192 F.3d at 621; *Thomas & Betts Corp. v. Panduit Corp.*, 138 F.3d 277, 291 (7th Cir. 1998); *Spraying Sys. Co. v. Delavan, Inc.*, 975 F.2d 387, 392 (7th Cir. 1992). If a reasonable fact finder could find for the opposing party, then summary judgment is inappropriate. *Stop-N-Go*, 184 F.3d at 677; *Shields Enters., Inc. v. First Chi. Corp.*, 975 F.2d 1290, 1294 (7th Cir. 1992). When the standard embraced in Rule 56(c) is met, summary judgment is mandatory. *Celotex Corp.*, 477 U.S. at 322-23; *Thomas & Betts*, 138 F.3d at 291; *Shields Enters.*, 975 F.2d at 1294. Finally, when considering cross motions for summary judgment, the Court construes the evidence and all reasonable inferences in favor of the party against whom the motion under consideration is made. *Durable Mfg. Co. v. U.S. Dept. of Labor*, 578 F.3d 497, 501 (7th Cir. 2009).

## B.  BREACH OF CONTRACT CLAIM UNDER NEW YORK LAW

The LMS Agreement provides that disputes arising under it are governed by the laws of the State of New York. LMS Agreement § 22.5. Under New York law, a party must prove the following elements to establish a claim for breach of contract: (1) the existence of a valid and enforceable agreement; (2) adequate performance by the party seeking to enforce the agreement; (3) breach of the agreement; and (4) damages as a proximate result of the breach. *See 24/7 Records, Inc. v. Sony Music Entertainment, Inc.*, 429 F.3d 39, 41-42 (2d Cir. 2005).

12

The interpretation of the terms of a contract provision are questions of law to be decided by the court.  *See Postlewaite v. McGraw-Hill, Inc.*, 411 F.3d 63, 67 (2d Cir. 2005).  "A fundamental tenet of contract law is that agreements are construed in accordance with the intent of the parties and the best evidence of the parties' intent is what they express in their written contract."  *Goldman v. White Plains Center for Nursing Care, LLC*, 896 N.E.2d 662, 664 (N.Y. 2008).  "Thus, a written agreement that is complete, clear and unambiguous on its face must be enforced according to the plain meaning of its terms, without reference to extrinsic materials outside the four corners of the document."  *Id.* (internal quotation marks and citations omitted).

### III.  DISCUSSION

In ANGEL's First Motion for Summary Judgment (Dkt. No. 31), ANGEL seeks summary judgment on each of HMH counterclaims.[3]  First, ANGEL claims that HMH's breach of contract claims are necessarily brought under the warranties, and that HMH failed to comply with the warranties' notice requirements.  Therefore, ANGEL argues that HMH's breach of contract claims fail as a matter of law.  Second, ANGEL claims that HMH's claim for unjust enrichment fails as a matter of law because the parties' dispute is governed by a valid and enforceable agreement.  Finally, ANGEL seeks summary judgment on its claim for declaratory relief.  ANGEL requests a declaration that HMH may not, under

---

[3] In response to ANGEL's motion, HMH voluntary dismissed Count III of its Counterclaim without prejudice.  Therefore, Count III of HMH's Counterclaim is **DISMISSED WITHOUT PREJUDICE**.

the terms of the LMS Agreement, both waive a Wind-Down period and require ANGEL to support *ThinkCentral 2* for a period of time after termination of the LMS Agreement.

In its second Motion for Summary Judgment (Dkt. No. 132), ANGEL seeks summary judgment on its claim for unpaid fees under the LMS Agreement.  ANGEL submits that, if the Court finds against HMH on ANGEL's First Motion for Summary Judgment, then ANGEL is necessarily entitled to summary judgment on its affirmative claim for unpaid fees.

In HMH's Motion for Summary Judgment (Dkt. No. 136), HMH seeks summary judgment on its breach of contract claim, ANGEL's breach of contract claim for unpaid fees, and ANGEL's claim for declaratory relief.  Put simply, HMH claims that ANGEL completely failed to deliver any workable LMS in breach of the LMS Agreement and that, therefore, HMH is entitled to judgment in the amount of $3.3 million, the amount of fees it has paid to ANGEL to date.  HMH's chief theory in support of its position is that the warranty provisions to which ANGEL refers the Court did not become effective until ANGEL produced a fully workable LMS.  Alternatively, even if the warranty provisions apply, HMH contends it provided sufficient notice to ANGEL pursuant to the terms of the LMS Agreement.

## A.  HMH'S BREACH OF CONTRACT CLAIMS

In its Supplemental Counterclaim, HMH essentially asserts two breach of contract claims: (1) that ANGEL breached the LMS Agreement by failing to deliver a Release that could pass all of the Verification tests; and (2) that ANGEL breached Section 3.3. of the LMS Agreement by failing to provide a version of the *ThinkCentral 2* that met the

Performance Criteria identified in Exhibit H of the LMS Agreement.  The Court considers each claim in turn.

### 1.  HMH's First Claim

As explained in more detail above, ANGEL provided specific warranties for each of the Releases, including a warranty that the Releases would pass all of the applicable Verification Tests.  ANGEL asserts that these warranties apply to HMH's claim regarding the failed Verification Tests, and that HMH's claim fails because it did not provide the notice required by the warranties.  HMH asserts that the warranties do not apply and that, even if they do apply, it gave ANGEL sufficient notice.

As discussed above, the warranty periods commenced when ANGEL (1) completed the Release; (2) delivered the Release to HMH; and (3) notified HMH of such delivery. HMH argues the warranties were never triggered because ANGEL never delivered a "complete" Release; namely, a Release that passed all of the applicable Verification Tests. HMH relies upon the definitions of each of the Releases, which state:

> [The relevant code drop or release (i.e. "Final Part A Delivery")] means the ANGEL LMS, the Tools, Documentation, and, to the extent required in order for the Deliverable Software in this deliver to pass all Verifications Tests that must be passed for this delivery, Modified Programs and other Initial Deliverables.  This delivery includes the source code for the Modified Programs that are included.

LMS Agreement §§ 21.21, 21.22, and 21.61.  HMH asserts that, based upon this definition, a Release is "complete" under the warranties only if it "pass[es] all Verification Tests that must be passed for this Delivery."  *Id.*  The Court disagrees.

HMH's interpretation of the Contract–that the warranty provisions did not apply unless ANGEL delivered a Release that passed all of the applicable Verification Tests–is belied by the clear language of the LMS Agreement, which is the best evidence of the parties' intent. *Goldman*, 896 N.E.2d at 664. The language demonstrates the parties contemplated the possibility that ANGEL may not deliver a Release that could pass all of the Verification Tests, and negotiated a remedy in the event that failure came to fruition. Through the LMS Agreement, ANGEL promised to deliver software to HMH, warranted that the software ANGEL delivered would provide the agreed upon functionality, and provided HMH a remedy in the event ANGEL failed. The definition of each of the Releases did not provide a prerequisite for the commencement of the warranties. Rather, the parties merely attempted to define each of the Releases based upon the Verification Tests each would have to pass.

This interpretation avoids the illogical result of providing for a major prerequisite to a warranty in the definition of the Release, instead of clearly providing for such a prerequisite in the actual warranty provision. Moreover, HMH's interpretation of the LMS Agreement essentially renders ANGEL's warranty regarding the Verification Tests meaningless. HMH claims ANGEL's warranty that the Releases would pass all of the Verification Tests would not become effective until the Releases passed all Verification Tests. In other words, under HMH's interpretation the warranty does not commence until it is satisfied. The parties could not have reasonably contemplated this result. *See Barnes v. Am. Intern. Life Assur. Co. of New York*, 681 F.Supp.2d 513, 521 (S.D.N.Y. 2010) (citations omitted) ("Under New York law, the key to contract interpretation is 'the parties' reasonable expectations.'").

16

Finally, the Court's interpretation is also consistent with the other terms of the LMS Agreement.  *Postlewait*, 411 F.3d 63 at 67 (citations omitted).  Section 21.48 provides, among other things, that ANGEL has committed a "major" breach if it fails to deliver "all or a substantial part" of the Releases by the date required by the Project Schedule.  Put differently, the parties contemplated that ANGEL could both (1) fail to deliver the entire Release and (2) not be in breach of the agreement, because ANGEL is only in breach of it failed to deliver a "substantial part" of the Release.  Moreover, the LMS Agreement, including the exhibits attached thereto, evidences the parties' intent that the Releases would be delivered and then modified on an ongoing basis.  *See, e.g.*, LMS Agreement Ex. E (referencing the *ThinkCentral 2* in its then-current form).

Therefore, Sections 4.7 and 4.8 are applicable to HMH's breach of contract claim based upon the failed Verification Tests.  Accordingly, the Court next considers ANGEL's argument that HMH's breach of contract claim is barred because HMH did not comply with the warranty provisions' notice requirements.

The limited warranties provided in the LMS Agreement are HMH's exclusive remedy in the event the Releases never passed the Verification Tests.  LMS Agreement §§ 4.7, 4.8.  In addition, the warranties only applied if HMH notified ANGEL of any failures within an agreed upon time period.  *Id.*  ANGEL asserts that HMH provided its first notice on August 26, 2008, even though the First Notice was due by May 5, 2008, for the First Release; July 15, 2008, for the Second Release; and August 24, 2008, for the Third Release.  Therefore, ANGEL asserts HMH's claims pursuant to the warranties must be dismissed.

17

ANGEL's argument fails.  The undisputed evidence establishes that HMH provided ANGEL regular and continuing notice of the Releases' failure to pass the Verification Tests applicable to each Release.  As HMH demonstrated in its briefing and designated evidence, which ANGEL never disputed or rebutted, *see Wollin*, 192 F.3d at 621*,* ANGEL cannot dispute that it received all the information necessary to trigger the warranties.  The warranties required HMH to "identify the failures and non-conformities" of the Release at issue.  LMS Agreement §§ 4.7, 4.8.  ANGEL can hardly claim HMH failed to identify the failures and non-conformities on a regular basis.  Indeed, on two occasions ANGEL was forced to delay the resolution of outstanding issues into the next Release.

Faced with this evidence, ANGEL is required to rely upon form over substance.  ANGEL takes the position that the several rounds of correspondence detailing the failures and non-conformities of the Release did not constitute "notice" under the warranties because they were not labeled as such.  ANGEL places great emphasis on HMH's initial titling (and later re-naming) of the August Notice.  ANGEL claims that, because HMH labeled the August Notice a "First Notice," that correspondence is necessarily the "first notice" under the warranties.  But the purpose of notice requirements in warranty provisions is to grant the party in breach of the warranty an opportunity to cure its breach before the non-breaching party elects to terminate the entire agreement.

Where, as here, the non-breaching party makes a good faith effort to comply with the contract's notice provisions, thereby granting the breaching party the ability to cure their breach, the Court will not "construe a notice provision as it if were a common law pleading requirement under which every slip would be fatal."   *Schwartz v. Fortune Magazine* 89 F.Supp.2d 429, 433 (S.D.N.Y. 1999) (quoting *Contemporary Mission, Inc. v. Famous Music*

*Corp.*, 557 F.2d 918, 925 (2d Cir. 1977)).  Rather, the Court will "look to see if [the] defendant's actions in terminating a contract served the general purpose of the contract's pretermination notice provision."  *Id.*  Here, the Court concludes HMH satisfied the general purpose of the LMS Agreement's notice provisions.  This conclusion applies equally to HMH's Notice of Termination, which ANGEL claims was twelve days late.  Therefore, with respect to ANGEL's argument that HMH's breach of contract claim is barred by HMH's failure to comply with the warranties' notice requirements, ANGEL's Motion for Summary Judgment is **DENIED**.

The prerequisites to HMH's ability to assert a breach of contract claim pursuant to the warranties have been satisfied.  Therefore, the Court considers whether there are any issues of material fact regarding the elements of HMH's claim under New York law.  The critical issue is whether ANGEL breached the LMS Agreement; namely, whether ANGEL failed to cure a failure or non-conformity after being notified by HMH.  ANGEL claims that HMH has failed to designate any evidence of a failed Verification Test after ANGEL was given a second notice.  As a result, ANGEL submits that HMH cannot demonstrate that ANGEL failed to cure any failure or non-conformity.

ANGEL's position is not supported by the designated evidence.  First, ANGEL cannot dispute that it was required to "roll over" several outstanding failed Verification Tests from the First Release to the Second Release, and the Second Release to the Third Release.  Moreover, in its briefing, HMH identifies and designates evidence in support of several failed Verification Tests that ANGEL failed to cure after the August Notice of Breach.  *See* Dkt. No. 183 at 7-8.  ANGEL failed to meet its burden to designate evidence that creates a genuine issue of fact in response to HMH's argument and designated

19

evidence.  *See Wollin*, 192 F.3d at 621.  Therefore, there is no genuine issue of material fact as to whether ANGEL breached the warranties.   However, because the Court concludes below that there remain genuine issues of material fact with respect to HMH's breach of contract claim under Section 3.3, the Court finds it prudent to not discuss the damages to which HMH is entitled, if any, as a result of ANGEL's breach of the warranties.

## 2.  HMH's Second Claim

HMH's basic claim is that ANGEL agreed to deliver a software system that would perform in such a manner as to satisfy HMH's business needs.  It argues that Section 3.3 covers the current dispute between the parties.  Section 3.3 requires ANGEL to correct "Support Failure[s]."  A Support Failure occurs when, among other things, "the ANGEL LMS fails to meet the Performance Criteria."   HMH claims that it notified ANGEL that *ThinkCentral 2* failed to meet the Performance Criteria, and that ANGEL failed to correct that failure in violation of Sections 3.3.  In response, ANGEL asserts that Section 3.3 only applies to its "off-the-shelf" software program (or its "core" software before it is tailored to a particular client's needs), and not to *ThinkCentral 2*.  In addition, ANGEL claims that, even if Section 3.3 applies, HMH failed to satisfy Section 3.3's notice requirements.  Finally, ANGEL asserts that there is a genuine issue of material fact as to whether the LMS it delivered to HMH satisfied the Performance Criteria.

As to ANGEL's argument that Section 3.3 only applies to ANGEL's "off-the-shelf" software,  the Court notes that ANGEL made this argument for the first time on March 4, 2010, in its brief in response to HMH's Motion for Summary Judgment, *see* Dkt. No. 167 at 15-16, notwithstanding having three opportunities to submit the argument prior to that

date in its briefs supporting its own motion for summary judgment.  *See* Dkt. Nos. 32, 102, 130.  In fact, instead of challenging the applicability of Section 3.3 to *ThinkCentral 2* in those briefs, ANGEL appeared to assume its applicability and instead only challenged the effectiveness of HMH's notice.  ANGEL may have waived this argument, but it certainly undercut any persuasiveness the argument may have had regarding the meaning of Section 3.3.

Under the unambiguous language of the LMS Agreement,  the term "ANGEL LMS" is not limited to ANGEL's "off-the-shelf" software program.  Rather, ANGEL LMS includes the customized software that ANGEL produces to meet the needs of the party licensing the software.  The LMS Agreement defines *ThinkCentral 2* as "the software system comprising the ANGEL LMS, Tools, Deliverable Software, and Harcourt-Made Modified Programs." LMS Agreement § 21.28.  A "Harcourt-Made Modified Program" is a program "that is coded solely or substantially solely by [HMH], an [HMH affiliate], and/or a subcontractor for them." Therefore, *ThinkCentral 2* consists of the ANGEL LMS, Tools, Deliverable Software, and other programs coded by HMH, its affiliates, or its subcontractors.  Consequently, under ANGEL's definition of ANGEL LMS–its core software without customization–the definition of "*ThinkCentral 2*" under the LMS Agreement would not include any of the customized changes made by ANGEL to its software, even though the contract clearly contemplates that ANGEL will customize it software prior to delivering it to HMH.  In order for "*ThinkCentral 2*" to include ANGEL's modifications, "ANGEL LMS" must not only include ANGEL's "core" software, but also the modifications ANGEL itself makes to ensure *ThinkCentral 2* passes the various tests upon which the parties agreed.  Therefore, under

Section 3.3, "ANGEL LMS" means the customized software ANGEL agreed to deliver to HMH under the LMS Agreement.

Next, ANGEL argues that HMH failed to give ANGEL sufficient notice of the ANGEL LMS's failure to meet the Performance Criteria pursuant to Sections 3.3, 18.2 and Exhibit E of LMS Agreement.  Specifically, ANGEL asserts that HMH's August Notice did not provide ANGEL the "same information [HMH] would require to recreate the problem in a similar environment."  LMS Agreement § 18.2, Ex. E, ¶ 1.  ANGEL submits that HMH did not provide a "sample of output showing the problem, expected results, [or] . . . a copy of the input transaction that caused the problem."  *Id.*  ANGEL also claims that HMH's August Notice was withdrawn because HMH failed to respond to ANGEL's request for additional information.

However, HMH has designated evidence that could lead a reasonable finder of fact to conclude it provided ANGEL sufficient notice pursuant to Sections 3.3, 18.2, and Exhibit E.  For example, there is a genuine dispute as to whether ANGEL actually needed more information.  If a jury believes HMH's version of the facts, which is at least in part supported by documentary evidence, ANGEL immediately began preparation for litigation upon receipt of the August Notice, the notice for which ANGEL claimed they needed additional information.  Moreover, the designated evidence also suggests that ANGEL was able to test the then-version of *ThinkCentral 2* according to the information contained in the August Notice of Breach.  A jury could therefore conclude that ANGEL's claimed need for additional information was not genuine and that, therefore, HMH met its duty under Sections 3.3. and 18.2, and Exhibit E.

ANGEL next argues that, assuming HMH provided sufficient notice, HMH nevertheless has failed to demonstrate that ANGEL was in breach of the agreement; namely, that *ThinkCentral 2* failed to meet the Performance Criteria.  HMH relies upon consultative reports from RCM, Capgemini, and Collaborative to demonstrate that the software ANGEL produced to HMH under the LMS Agreement did not satisfy the Performance Criteria.  To summarize, these entities' reports opine that the *ThinkCentral 2* did not meet the Performance Criteria.  HMH hired RCM and Capgemini prior to litigation, whereas Collaborative was hired after litigation commenced.

ANGEL moves to strike the reports of each of these entities.  First, ANGEL claims that HMH failed to properly identify and provide a report for RCM and Capgemini.  Initially, the Court notes that RCM and Capgemini are not fact witnesses as HMH suggests.  HMH relies upon each to opine whether, based upon their expertise, *ThinkCentral 2* met the Performance Criteria.  However, HMH referred to and relied upon reports from RCM and Capgemini in its November 9, 2009, pleading in response to ANGEL's motion for summary judgment, some four months before ANGEL asserted this motion to strike.  Therefore, the Court concludes that HMH sufficiently disclosed these entities to ANGEL.

As to Collaborative's report, ANGEL first argues that the report is irrelevant because Collaborative tested *ThinkCentral 2* against the performance criteria, and the performance criteria only apply to the ANGEL LMS under Section 3.3.  The Court considered and rejected this argument above.  Next, ANGEL designates the declaration of Jason O'Brien, ANGEL's information technology manager, who declares that (1) HMH's hardware, and therefore not ANGEL's software, caused *ThinkCentral 2* to malfunction; and (2)

Collaborative used a flawed methodology to test *ThinkCentral 2*.[4]  Dkt. No. 168-7.  The Court concludes that, if credited by the trier of fact, both the Collaborative report and O'Brien's declaration create a genuine issue of material fact as to whether *ThinkCentral 2* failed to meet the Performance Criteria.[5]  Therefore, HMH's Motion for Summary Judgment on its claim under Section 3.3 is **DENIED**.  Likewise, ANGEL's Motions for Summary Judgment on its claim for unpaid fees and HMH's breach of contract claims are **DENIED**.

### B.  HMH'S UNJUST ENRICHMENT CLAIM

In Count II of its Counterclaims, HMH asserts that it is entitled to receiver the $3,300,000.00 paid to ANGEL under an unjust enrichment theory.  Both parties have moved for summary judgment on this claim.  The parties' dispute is purely one of law: whether HMH may recovery under an unjust enrichment theory where a valid and enforceable contract exists and addresses the very dispute at issue.  The answer is no.  New York law is clear that "theory of unjust enrichment lies as a quasi-contract claim.  It is an obligation the law creates in the absence of any agreement."  *Goldman v. Metropolitan Life Ins. Co.*, 5 N.Y.3d 561, 572 (N.Y. 2005) (citations omitted).  Therefore, where, as here,

---

[4] HMH's Motion to Strike O'Brien's Declaration is **DENIED**.  ANGEL timely disclosed O'Brien as a rebuttal expert, Dkt. No. 193-2, and O'Brien was not required to submit a report because he does not typically provide expert testimony as part of his employment with ANGEL.  Fed. R. Civ. P. 26(a)(2)(b).  HMH's other challenges to O'Brien's declaration are better explored either through a pretrial motion *in limine* or on cross examination.

[5] The Court notes that ANGEL filed a motion to exclude Collaborative's expert, **name**, prior to the now-vacated trial date under *Daubert*.  However, ANGEL did not specifically challenge the Collaborative Report under *Daubert* during summary judgment, and the Court will take that motion under advisement.

a valid and enforceable agreement covers the dispute that has arisen between the parties, a claim for unjust enrichment (and restitution) must fail. *Id.* Moreover, HMH's reliance on the terms of the LMS Agreement in support of its position that it may assert an unjust enrichment claim is misplaced. A claim for money damages based upon the terms of a contract is by its very nature a breach of contract claim. Therefore, ANGEL's Motion for Summary Judgment as to Count II of HMH's Counterclaim is **GRANTED**. HMH's Motion for Summary Judgment as to that Count is **DENIED**.

### C.  WIND-DOWN FEES

Finally, ANGEL moves for summary judgment on its claim for declaratory relief. In its Notice of Termination, HMH instructed ANGEL that HMH elected to waive a Wind-Down Period under Article 10 of the LMS Agreement, but also required ANGEL to support the latest version of *ThinkCentral 2* at no cost to HMH. ANGEL argues that the LMS Agreement provides HMH only two options upon its decision to terminate the agreement: (1) elect to participate in a Wind-Down Period, during which HMH must pay ANGEL fees for its use of ANGEL's software; or (2) waive a Wind-Down Period and immediately return or destroy the ANGEL LMS in its possession. ANGEL asks the Court to declare that HMH may not both waive a Wind-Down Period and continue to use the ANGEL LMS without paying ANGEL fees.

Under Section 10.1, "[a]fter any termination . . . of the Main Term, including without limitation any early termination of [the LMS Agreement] during the Main Term, . . . there shall commence immediately a period during which [the LMS Agreement] and all licenses

[t]hereunder shall remain in effect (the "**Wind-Down Period**")."  LMS Agreement § 10.1 (emphasis in original).  Under Section 10.4, HMH is required to pay fees to ANGEL if it elects to participate in a Wind-Down Period.  LMS Agreement § 10.4.  HMH may elect to waive a Wind-Down Period after it terminates the LMS Agreement because of a Major ANGEL Breach.  *Id.* § 10.1.  Under Section 10.5, "[u]pon the expiration or termination of the Wind-Down Period or, if there is no Wind-Down Period, then upon the expiration or termination of the Main Term, [HMH] shall exercise commercially reasonable efforts to destroy all copies of the ANGEL LMS and any other materials received from ANGEL hereunder . . . ."  According to ANGEL, Sections 10.1 and 10.5 clearly dictate that HMH may not waive a Wind Down Period and continue to use the ANGEL LMS without paying fees to ANGEL.

HMH, on the other hand, points to Section 18.2, which addresses Support Failures as discussed above.  Under Section 18.2,

> If the Support Failure . . . continues for a period of thirty (30) days after th[e] second notice has been given by [HMH] ("**cure period**"), [HMH] may, by further notice ("**third notice**"), within thirty (30) days after the expiration of the cure period, require ANGEL to support the last release of ANGEL LMS that had no uncorrected "System Down" or "High Failure" Support Failures (of if there is no such release, then whatever release [HMH] may choose) and the immediately previous release and, if [HMH] elects, terminate this Agreement . . . ."

LMS Agreement § 18.2 (emphasis in original).  HMH claims that it is entitled to require ANGEL to "support" *ThinkCentral 2* until it finds a replacement.

ANGEL's interpretation of the LMS Agreement–that HMH may either require ANGEL to support the ANGEL LMS or terminate the LMS Agreement–fails to adhere to the express language of Section 18.2, which clearly states that HMH may "require ANGEL to support

the . . . ANGEL LMS . . . and . . . terminate [the LMS Agreement.]"  *Id.*  To the extent Section 18.2 conflicts with Article 10, "it is a well-established principal of contract interpretation that specific provisions concerning an issue are controlling over general provisions."  *Huen New York, Inc. v. Bd. of Educ. Clinton Cent. Sch. Dist.*, 890 N.Y.S.2d 748, 749 (N.Y. App. Div. 2009); *see DBT Bmbh v. J.L. Min. Co.*, 544 F.Supp.2d 364, 377-78 (S.D.N.Y. 2008).  Here, Section 18.2 covers the specific set of facts at issue; namely, ANGEL's alleged breach of the LMS Agreement for failure to cure a support failure.  To the contrary, Section 10.5 applies generally to terminations of the LMS Agreement.  Therefore, the Court concludes Section 18.2 controls, *id.*, and ANGEL's Motion for Summary Judgment on its claim for declaratory relief is **DENIED**.

### D.  ANGEL'S MOTION TO SUPPLEMENT COMPLAINT

ANGEL moves the Court to add a new theory for its breach of contract claim and three claims for fraud, promissory estoppel, and injunctive relief.  According to ANGEL's new allegations, HMH represented to ANGEL in its Notice of Termination that HMH intended to place the disputed Main Term Fees into an escrow account.  This had the effect of prohibiting ANGEL from terminating the LMS Agreement.  LMS Agreement § 7.8.  ANGEL claims that HMH actually placed the disputed funds into a regular account, then withdrew the funds when HMH transferred from the ANGEL LMS to another entity's software system.  ANGEL alleges it has suffered damages has a result of this conduct, and seeks to add claims as a result.  HMH responds that the added claims are, among other things, untimely and futile.

ANGEL's Motion to Supplement Complaint is **GRANTED**.  To the extent HMH claims it will be prejudiced by any amendment to the Complaint, HMH will have ample opportunity to challenge the sufficiency of ANGEL's new claims prior to the trial of this matter.  This will also give HMH the opportunity to test its claim that the motion is futile.

## IV.  CONCLUSION

For the foregoing reasons, the Court makes the following rulings:

1. The parties' motions for leave to file surreply briefs (Dkt. Nos. 178, 192, 197) and the corresponding motions to seal (Dkt. Nos. 195 and 198) are **GRANTED**.

2. ANGEL's Motion for Summary Judgment and Declaratory Relief (Dkt. No. 31) is **DENIED**.

3. ANGEL's Motion for Summary Judgment on its Claim for Unpaid Fees (Dkt. No. 132) is **DENIED**.

4. HMH's Motion for Summary Judgment (Dkt. No. 136) is **GRANTED in part and DENIED in part**.

5. ANGEL's Motion for Leave to File Second Supplemental Complaint (Dkt. No. 150) is **GRANTED**.  ANGEL's Supplemental Complaint is deemed filed as of this date.

IT IS SO ORDERED this 12th day of August, 2010.

LARRY J. McKINNEY, JUDGE
United States District Court
Southern District of Indiana

Distribution attached.

28

Distribution to:

Sean P. Burke
BARNES & THORNBURG LLP
sean.burke@btlaw.com

Michael T. McNally
ICE MILLER LLP
mcnally@icemiller.com

Scott E. Murray
BARNES & THORNBURG LLP
smurray@btlaw.com

Irwin B. Schwartz
BUSINESS LITIGATION ASSOCIATES, P.C.
ischwartz@business-litigation-associates.com

T. Joseph Wendt
BARNES & THORNBURG LLP
jwendt@btlaw.com